And a court of pursuit to the fourth case, Demkovich v. St. Andrew the Apostle Parish. May it please the court. This is the 1292B certified interlocutory appeal of the district court's denial in part of a motion to dismiss made by the Archdiocese of Chicago in this case involving an admitted minister of the Catholic Church. The issue in the case is the ministerial exception and in particular whether the ministerial exception acts to bar all claims brought under the federal employment discrimination statutes irrespective of what type of employment discrimination claim was brought. In this case in particular the claim was a hostile work environment claim and the one put at issue by the Archdiocese in this appeal involved the allegation that the pastor of a Roman Catholic parish used words to a subordinate minister involving his weight that the subordinate minister found to be offensive. And at the outset it's important I think to recognize the context of the dispute. It arises solely from words spoken by a superior minister to a subordinate minister concerning a matter of concern to the superior minister about the subordinate's weight, his appearance, and therefore his fitness for ministry and qualifications to be a minister. On the law, the ministerial exception bars all employment discrimination claims. To begin with, the ministerial... Is that what Hosanna Tabor held? Hosanna Tabor didn't reach the question itself. Hosanna Tabor involved a case involving a termination of a ministerial employee... And was careful to limit the holding, the firing of a minister, correct? We disagree that it limited the holding to the facts of that particular setting, but in Hosanna Tabor the court in limiting its holding distinguished employment discrimination claims from other types of claims. The court did say we are not yet reaching whether the ministerial exception applies to other types of claims such as contract claims and tort claims, which are both common law claims that do not arise out of the employment relationship with a minister as such. And that is the point. The reason for my assertion stated boldly at the beginning that the ministerial exception would bar all employment discrimination claims is that unlike independently standing tort claims and contract claims, claims brought under the federal employment discrimination statutes exist solely by virtue of the employment relationship and nothing else. Isn't that also sometimes true of contract claims? It can be true that there is an employment relationship. However, the claim exists by virtue of the contract, meaning that the parties have voluntarily undertaken legal duties arising from that contract. And then if they violate those duties, a court can analyze whether the claim is justiciable. Even in those kinds of cases, there may be First Amendment barriers to the claim proceeding, but it would be a case-by-case analysis. The point about the employment discrimination laws is that the federal government has inserted itself into the employment relationship between employers and employees and created rules and obligations and claims that would not exist but for the employment relationship. Let's say that an African-American man is hired as music director and his supervisor is a bigot. The supervisor uses racial epithets, tells him that a black person has no business in the church, hangs a noose over the music director's desk. You get the idea. Would you still be invoking the ministerial exception even if, as in the Ninth Circuit Bullard case, the church disavows such behavior? Or suppose a woman is hired for the position and she is verbally and physically harassed on a daily basis. The exception would still apply in your view? Well, I don't think the ministerial exception would necessarily apply if somebody hung a noose over a desk. That's a threat of physical violence, and it would not apply to bar such a claim. But it would bar the claim brought… It's a claim brought under Title VII. Yes, it would. Right. Yes, it would. And the reason is this. It has to do with the structure of the law. The claims brought under Title VII exist solely by virtue of the decision to retain the minister in the first place. Allowing claims brought under Title VII burdens that choice. It actually burdens the selection of the minister. And although there could be some cases where one might imagine less intrusion into the church's management, discipline, and control of its ministers, as a whole, as a category of cases, allowing those claims to proceed invites that kind of an intrusion. The cases on which… Does the Archdiocese have a workplace code of conduct or a nondiscrimination policy? Some churches do, and the Archdiocese has policies of that nature. But as the cases hold, the ministerial exception is not waivable. It is a barrier to the court acting. And again, because the employment… But what kind of conduct was the conduct that was alleged here consistent with the Archdiocese's policy? I don't know that the Archdiocese has a policy regulating the kinds of words a pastor might use to discuss the physical fitness, the weight, and the condition of a music director. However, under the hierarchical structure of the Catholic Church, the pastor of the parish does have the hierarchical authority to manage, discipline, and supervise subordinate ministers in the parish, as this pastor did here. We might not endorse the words he chose. Does the Roman Catholic Church have physical fitness standards for clergy? I have no idea what the standards in the seminary are, for instance, for physical fitness, but it really would not be for the court to decide whether… I'm just asking whether they exist in the history of the Roman Catholic Church. I can't answer that question. I'm not aware of… But that actually is beside the point, because the pastor, in his own opinion, could believe as the hierarchical superior of that parish that he didn't want a music director, who is a minister, to appear to his congregation looking in a certain fashion or being in a certain physical condition. Or there is a whole other component to it. The discipline imposed by a superior minister over a subordinate can include care for that person. Can it include corporal punishment? No. It's an act of violence, and the ministerial exception does not apply to claims outside the employment discrimination laws, such as battery, a tort. It's a good example of the distinction. So Judge Rovner asked you a few minutes ago about a case of a sexually hostile environment, which includes unwelcome touching. Yeah, and the answer is that an unwelcome touching that is litigated as a battery would proceed on its merits. As a tort. As a tort. However, commandeering the decision to retain a minister as the basis for there even being a claim in the first place would be the violation of the Constitution and why the ministerial exception would apply. The cases on which the doctrine is built, McClure especially, do not talk about tangible and intangible employment actions or specifically whether the church has teachings that allow or don't allow the conduct involved. They are built on the church-minister relationship and the fact that the state has no business interfering with it. The manner in which a superior minister interacts with a subordinate minister is not the business of the state. And when you are talking about the regulations. But in some cases it can be, right? It can be when it involves behavior or actions that are independent of the church-minister relationship, i.e., the employment relationship when it comes to a ministerial employee. That is the key distinction. Nobody is endorsing bad conduct or bad words. But what is justiciable in court has to do with whether the court is relying on the decision to make the person a minister as a basis for there even to be a claim in the first place or not, number one. And number two, whether allowing this type of claim to proceed would, by necessity, involve officious investigation and interference in the church-minister relationship, which was at the core of holdings like Sharon and McClure. Could you address – one of the issues that we need to deal with with respect to the Title VII claim here is whether just the litigation of the claim involves excessive entanglement. And could you address – there was a case some years ago, the Supreme Court decided, Ohio Civil Rights Commission against Dayton Christian Schools. It was written as a younger abstention case, and the court found that younger abstention should apply in essence precisely because the investigation itself of the conduct was not thought to be unduly intrusive. They'd worry later about the outcome and whether there was a constitutional defense to the outcome. So entanglement can happen in different ways. The case that would come to my mind would be NLRB versus Catholic Bishop. Now, the challenge is to hold those two cases together. Yeah, and as – and I'm going to take some credit for at least trying to say this word – as the Skrzipczak case from the Tenth Circuit holds, our argument is that allowing the investigations of the types of claims that would arise in hostile work environment cases would necessitate the sort of investigation that would in fact cause excessive entanglement, both, as Skrzipczak said, gross, substantive, and procedural entanglement. And it has to do with the kinds of things that the court would need to ascertain. What is under investigation is the work environment of a Roman Catholic parish in this case, in particular the work environment of a minister in a Catholic parish, which calls into question all the various aspects of what the minister is asked to do and the kinds of interactions the minister is having. It also calls into question what kinds of words – in this particular case calls into question what kind of words a supervising pastor is allowed to use in disciplining or correcting a subordinate pastor. Counsel, if I could, I'd like to raise with you what I see as sort of a fundamental institutional issue here. The Hosanna-Tabor came after decades of litigation in a variety of cases in the district and circuit courts. And the court then finally embraced the ministerial exception and gave us a lot of guidance about that. But not really very much – it didn't address this problem. As I think Judge Rovner's hypotheticals indicate, you're asking us for a very bright-line rule, really where we haven't even begun to see the variety of claims that might arise. So I'm wondering how prudent it would be for us to adopt that – at this point, at least – that bright-line rule you're asking for when we can start to hypothesize some pretty horrific situations that we hope would be rare, but given the variety of people and religious institutions, who knows what we may see. Well, I would have two responses. The first is that the reason a bright-line rule is justified is where the ministerial exception comes from and what it's based on. It's meant to keep the government out of the church-minister relationship, not just the hiring and firing, the beginning and the end, but the middle as well, which is the management of the minister, the discipline of the minister, and the problem with employment claims. My problem – well, okay. I understand the point. I mean, the problem with employment claims, as opposed to independently standing tort and contract claims, is that they are just integrally entwined with the employment relationship with the minister. It's a place the state has no business being. In Milošević, the Supreme Court said that where the subject matter of the dispute is essentially religious, the deference has to be to the church in adjudicating the question, including the management of one of its ministers. That is the basis of McClure, saying that the church-minister relationship is what needs to be protected from government interference. Now, if within that relationship a church commits a bad act against the minister that exists independent of the church-minister employment relationship as such, such that that decision to employ the minister is not burdened, but rather the conduct independent of that is tortious, is criminal, is a breach of a contract, that's how you address the parade of horribles that is suggested by the hypotheticals, and that is how you still allow people who have been injured to seek some kind of a remedy. On the other hand, if you have to commandeer the decision to make the person a minister as a basis to even have a claim, if you have to use the relationship as an employment relationship with a minister just even for there to be a rubric to bring the claim, such as in investigating the work environment of a minister to decide if it was hostile, when the underlying alleged discriminatory conduct is immunized under the ministerial exception, one of the examples that Judge Rovner gave me was, imagine you have a racist, bigoted, supervising minister who does a number of offensive things, but on the other hand, in the case called Young, this court dismissed the claims of a United Methodist minister who brought race discrimination claims against the United Methodist Church. Not that that's a good thing to believe, not that it's a good thing to do if it was true, but the church actually was entitled to conduct itself in a racist way in its relationship with the minister. No one's endorsing that, of course, but that is because the only basis for the claim was the employment relationship with the minister. If some other act, like a threatening act, like putting a noose on someone's desk were to occur, that's independently actionable. My time is just about up. I see I've used my rebuttal time as well, or most of it. Let me just conclude by saying that we do think that this court in Alisea did adopt a very broad standard for the application of the ministerial exception. That was a case where the pro se plaintiff did complain of being humiliated and having been caused emotional distress by the work environment as part of her claim. That case was relied on in Skrzipczak, and the Tenth Circuit certainly was comfortable with the bright-line test that Your Honor suggested, and we urge this court to do the same. We urge you to reverse the decision of the district court in its denial in part of the Archdiocese's motion to dismiss based on the ministerial exception. Thank you, Mr. Gilbert. Ms. Zolkowski. Good morning, Your Honors. May it please the court. My client, Sandor Demkiewicz, seeks that this honorable court affirm the district court's ruling, allowing his claims of hostile work environment and harassment to proceed. I want to address the— Could I make something clear for myself, please? You're only arguing for recognition of the disability-based harassment claim here, as opposed to a sex or sexual orientation-based hostile environment, right? My client would like to proceed on the harassment and hostile work environment, the disability-related claims, as well as the sex and sexual orientation. The district court dismissed those claims, but as the whole order is here under appeal, my client would like to see those claims proceed as well. Okay. All right. Thank you. First, I would like to address the concept that was raised by counsel for the Archdiocese, saying that these were merely words spoken and that there was a conceivable or possible religious purpose for those words. I want to clarify for the court that in the Archdiocese's answer, they've denied that those words were spoken. They've denied that these instances occurred of the alleged harassment. In terms of the physical fitness and weight requirement that was discussed, I would like to address that as well, that Mr. Demkevich had these disabilities. He had essentially this weight when he was employed. The term of employment was very short. It was two years. And within his first meeting of Father Dada, it was noted that his weight was an issue, such that Father Dada commented that it would be cost prohibitive to insure Mr. Demkevich on the church's health insurance plans. With respect to a hostile environment claim based on disability, how should a court distinguish between actions that are genuinely harassing and actions that may have a good faith basis? For example, a supervisor who expresses concern about an employee's weight and health. Well, Your Honor, I would argue, one, that I don't believe the Archdiocese in this instance expressed or the employer, St. Andrew the Apostle, expressed concerns in any sort of fashion that was meant to address the issue. In terms of direction or trying to attempt to get Mr. Demkevich's weight as an issue from which they were redirecting him, counsel for the Archdiocese would argue that this was a management issue. But I don't think, and Mr. Demkevich doesn't think, that management is harassment and that harassment is management. I don't think they're synonymous. And I think there was no management or controlling efforts. It was merely only conduct that crossed the line into harassment. And that's what's alleged in the amended complaint. The question in front of us is pretty broad. And to follow up on that, I guess one of the problems that I have is that habits or practices of counseling or eldering people within the church or within the ministry have a very long tradition, at least the Judeo-Christian tradition. And I can easily imagine that kind of counseling or eldering being firm, persuasive, offensive, threatening the damnation of the eternal soul, for example. Could that be harassment, actionable under Title VII? Well, I think it would depend on the issue itself, right? If we're talking about something that was related to the church's teaching and its attendance, then I would say that... Okay, how about same-sex marriage? Well, Your Honor, I mean, same-sex marriage is something that the church has established a position about. That is true. But on issues of diabetes... You are asking us to decide the sex issue as well. Yes, Your Honor. So let's please answer the question. In terms of same-sex marriage, I would say that those comments fall into a line where there is a religious-type claim, a religious purpose for those. And I think that's difficult to avoid, that the church does have a position as to same-sex marriage. And so in terms of the type of direction that you're describing, I would think that that would be more towards a religious purpose than the disabilities that are discussed here. But I think it does go to say that Mr. Demkevich's work environment, even if there was a religious purpose for the same-sex marriage harassment, that it does show a pattern of practice of harassment in Mr. Demkevich's workplace about both topics, about the marriage and about the disability. Well, let me try on the disability issues. How does one distinguish between vigorous counseling to try to get somebody to change his lifestyle for his own benefit and the benefit of the church, and harassment? Well, if there is a requirement for literal fitness, as in being fit, the church has definitely not pleaded that. And, again, the issue was present at the time he was employed. But in terms of how to do so, I would say that if the employer had tried more traditional means, in addition to harassing behaviors, then I would say that that would carry more weight and credibility, that they ran the gamut of management of their employee, that some things are what we would consider offensive in any other workplace environment and some things were acceptable within the workplace environment. I believe that when the actions alleged are only those that are hostile, severe, pervasive, that those actions themselves, without another type of... How about you're killing yourself and you're endangering your soul? Well, Your Honor, I think that in this stage, what we're looking at is whether or not these actions are, whether or not a cause of action under these allegations, I don't know exactly how I would... The question is here on, the case is here on 1292B with a very broad question in front of us. So I appreciate you're trying to tie the case specifically, tie things specifically to the allegations in this case, but we have to look more broadly at this. To be frank then, I would say that someone's weight is going to end up with eternal damnation, I would say that's not connected to the religious purpose. And moreover, we haven't had a religious purpose, a religious basis for these activities actually brought by the archdiocese. For their part, they deny it. Ms. Olkos, following up on a series of inquiries by Judge Hamilton, doesn't that speak in the challenge you face in parsing, and I don't mean that in a derogatory sense, but just parsing where the line would fall, doesn't that speak to why there is the ministerial exception, that we're not supposed to get into it? In a normal workplace setting, this, when I say normal, I don't mean outside the religious context, that's another thing. But the ministerial exception speaks to a bright line, doesn't it? Yes, I believe it does. But in this instance, we haven't, the archdiocese has not, for its part at all, admitted to the behavior or offered any kind of religious purpose for it. They've only strictly denied it. Yeah, but are we to make the inquiry, I guess is what I'm saying. If he was, you know, a battery had been committed or, you know, when we talked about a torch situation, that's clear. But the house-to-work environment, which is multifaceted in many instances, that's what the ministerial exception is all about, that we don't examine it. As compelling as it might be, that's what the ministerial exception is about. There's a price maybe to be paid for having that, but that's what's been established. I would argue that the ministerial exception is not about that. The ministerial exception set forth in Hosanna Tabor expressly declined to extend its ruling to tortious conduct, breaches of contract, and other actions outside their purview, such to the point that the court, while not even offering a bright-line test on what constitutes a minister, expressly stated that it wasn't extending that action or its ruling toward these other types of conduct. And insofar as Mr. Demkevich's claims are not pertaining in any way, those concerns were assuaged by they're not pertaining to any kind of hiring, firing, compensation, assignment. Those are the elements of management. Management is not harassment. There was no management of his weight. There was no effort by the church to look into ways to get Mr. Demkevich's diabetes and metabolic syndrome remediated in some other way. It was only these efforts. How do we know that? Just by the words? Is that what you're saying, that we don't have words of counseling? We have words of criticism? So, therefore, the criticism falls on one line as opposed to counseling? Is that what you're saying? Right. It's the words themselves. So that's my point. How do we parse the criticism versus the counseling up against the wall of ministerial exception? The same way we would in any other case pertaining to a harassing environment. Well, I suggest the ministerial exception is pretty different than most cases. Well, but counsel for the archdiocese concedes that corporal punishment or battery would be actionable. But under the ministerial exception, these other issues would not be actionable. Somehow the line is drawn there. But I don't see that there's any more or less entanglement in an inquiry about corporal punishment than there is an inquiry about these words that are spoken. When we're looking into someone's use of corporal punishment in the religious employment environment, there is an inquiry as to that employee's working circumstances, the same type of inquiry that would take place for this non-physical or non-threatening, so to speak, conduct that still in a non-religious workplace would be considered actionable. So we would then depose, let's say in this case, the superior minister as to what his intent was in his comments? Is that what you would envision in a deposition? Yes, and as to what was spoken and why it was spoken. And if hypothetically it's placed in the context of, I don't know about eternal damnation, but a religious purpose is advanced in the deposition, does that put an end to it?  So you have the deposition and the superior says, my comments may be not received well or not well-spoken, but they're all in a sense of caring for the inferior minister. What happens when we get into trying to analyze what the intent was in these situations as against the ministerial exception? Well, I wouldn't say that the question should be whether or not the intent was good-natured. I would say whether or not the intent had some sort of religious purpose. Yeah, so I'm suggesting to you a religious purpose is advanced. Let's say you and I might not find that a compelling answer, but it's given, and either church doctrine is about physical well-being or concern for everybody in the parish. Some general statement is made like that. Isn't that the mix of inquiry that the ministerial exception is set up to avoid, really? I mean, I understand you want to make the inquiry. I'm just saying the cases seem to suggest that that's sort of a quagmire that we're supposed to avoid, right? Well, I think that many cases that we have look into whether or not the religious justification provided is not an artifice, that it's not subterfuge. And so I think that that inquiry would be made in this instance as well. Well, then the ministerial exception would have to be challenged in almost every case as to credibility, right? If we have a myriad of hostile work environment vignettes that we play out and that the charge is made, so then the church has to answer to that in every case, gets past summary judgment for sure, and have to have depositions. Well, I mean, the Lausanne-Tabor ruling in footnote 4 specifically states that the ministerial exception is an affirmative defense, such that the pleading would be necessary to get to the point of the archdiocese or the defendant in any instance providing an answer. No, all it has to do is affirm that the person is a minister. Say that again? All the defense requires outside the hostile environment context is simply asserting and then, if necessary, proving this person qualifies as a ministerial employee, right? For tangible employment actions. Right. We don't get into questioning the legitimacy or sincerity of religious justifications. Well, for non-tangible employment actions, I would say that that would be a consideration, an important consideration. Could I ask you about the district judge's treatment of the Title VII claim where the district judge rejected the Bright Line rule but concluded that in this particular case, as I understand his decision, there was an excessive risk of entanglement in pursuing these issues involving same-sex marriage? Yes. You've asked us to overrule that. Can you suggest any methods of case management that would help prevent such entanglement in this case? Entanglement on both issues, the ADA and the Title VII? I'm focusing in particular on the sex discrimination claim where the district judge focused on the entanglement issue. Well, I would say discovery management at the district court level would be able to allow the process of oversight to occur such that if the process of discovery were to tread on matters that were religious in nature or matters pertaining to hiring and firing, then we would get outside those lines. But in terms of an inquiry as to whether or not the behavior was harassment by its definition— It would have to get into motivation, though, wouldn't it? Well, I think that that's part and parcel of the inquiry. So, yes. My time is up. That's all right. I don't want to preclude you. We've asked a fair amount of questions. If you have some further comments, you may go ahead. Well, Your Honor, I just would like to say that I believe that the Hosanna-Tabor ruling in its expressly declined to do so, and in saying so said that there will be time enough to address the applicability of this exception to other circumstances if and when they arise. And we believe that moment has arisen now with Mr. Demkevich's claims and the conduct that's at place and at stake here. Accordingly— What would we have to do with Alicia Hernandez? Do you think that has to be overruled? Well, Your Honor, I think with Alicia Hernandez, the issue is a matter of clarifying those nine words. What did the court mean when it said those things, when it said that statement? I'll pull it up. That the ministerial exception applies regardless of the type of claims being sought. I don't think that this court meant to say that the ministerial exception applies to every claim, and that really wasn't at the heart of the Alicia Hernandez case. That case was about— Well, that was a house-to-work environment case. Well, Your Honor, it really dealt with constructive discharge. There was no allegations of things being said and whether or not they had a religious purpose or not. While the pro se plaintiff in that case discussed hostility, really the hostility itself was not the action. It was that it amounted to constructive discharge, such that the ministerial exception ended that inquiry. But in this instance, we're not talking about the termination per se. We're talking about the conduct that took place between the dates of hiring and termination. And in that instance, I would say that Alicia Hernandez is being used to say that this kind of claim should be barred, when in actuality, that case doesn't stand for that proposition. And I think the Archdiocese's reliance on it and the Skrcipic ruling adds more confusion. I think this court has the opportunity to, with this ruling on Mr. Demkevich's claims, close the circuit split because the case that Skrcipic relies upon is Alicia Hernandez most principally. And if the court clarifies the ruling in Alicia Hernandez, then the Skrcipic ruling will have much less import. All right. Thank you. Thank you. Mr. Gurley, we asked you a fair amount of questions too, so you may have two minutes. Thank you, Judge Flom. Alicia Hernandez, quote, I was subjected to prolonged humiliation and emotional stress of working under unequal and unfair conditions of employment, was excluded from management meetings, training, and information required me to perform my duties. She brought a hostile work environment claim. That's not a hostile environment claim. That's a routine discrimination, sex discrimination claims based on conditions of employment. She was a pro se plaintiff. You're excluding me from meetings. It's not sexually explicit, sexually hostile treatment. Well, the claim wasn't limited to sexual harassment, but she was a pro se plaintiff, and she was vague in the way she made her allegations. I don't think it's fair to say that no element of our consideration today was here. Also in Alicia Hernandez, and perhaps more importantly in light of the last argument, and I quote, it is therefore not our role to determine whether the church had a secular or religious reason for the alleged mistreatment of Alicia Hernandez. I think the entire inquiry about whether there's a religious justification is beside the point. What matters is the identity of the employee as a minister. That's what takes the case out of the judicial can. Regarding the Title VII claims and management of discovery and the risks of entanglement, the deposition of the pastor is your first issue. Subjecting the pastor to a deposition on the manner in which he spoke to a subordinate minister about the issue of same-sex marriage, sexual orientation, and homosexual practices in regard to the church's teaching on those issues, scrutinizing his opinions about that, and deciding whether and what he meant when he said it, why he said it, how he felt when he said it, is exactly the kind of searching inquiry that the Milošević court prohibited. It is exactly why the Supreme Court in Hosanna Table recognized a constitutional basis for the ministerial exception, even though that case dealt with the termination, and goes back, really, to the basis of McClure, which is to say that the church-minister relationship is shielded from government intrusion. If a tort, a crime, a breach of contract occurs independent of the church-minister employment relationship, it is independently actionable. And the case-by-case analysis of whether the First Amendment creates barriers to the claim will happen. But if the claim is based on the employment of the minister itself as such, then the court has crossed the line. That is our argument for this court to follow the Tenth Circuit INSCR zip check, and yes, adopt a bright-line rule so this prohibited inquiry doesn't occur in the first place. Thank you. Thank you. Thank you to all, counsel. The case is taken under advisement.